UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re: | Case No. 6:26-bk-05428-GER

**SHERWOOD CONSTRUCTION, INC.,** | Chapter 11

Debtor.
____________________________________/

**SHERWOOD CONSTRUCTION, INC.,**
Plaintiff,

v. | Adv. Pro. No. ________________

**KEN DIXON; PEDIXON, LLC; ZPD, LLC;**
**PARKE FINANCIAL LIMITED PARTNERSHIP;**
**CRESCENT SOUND, LTD.;**
**ALISON PITKANEN; and**
**ALISON PITKANEN, P.A.,**

Defendants.
____________________________________/

**COMPLAINT**

Sherwood Construction, Inc., the debtor and debtor in possession ("Sherwood" or the "Debtor") sues Ken Dixon, PEDIXON, LLC, ZPD, LLC, Parke Financial Limited Partnership, Crescent Sound, Ltd., Alison Pitkanen, and Alison Pitkanen, P.A. (collectively, the "Defendants"), and alleges:

Sherwood built things for forty years. It was killed by a pandemic, and then it was harvested. The Defendants took the wreckage of a general contractor that had already lost more than $13,000,000 on pre-pandemic contracts and turned it into a source of supply: for usurious interest, for lawyer's fees, and for the funding of a real-estate acquisition that was meant to help Sherwood and from which Sherwood received no compensation.

The instrument was the lawyer. Sherwood placed its collections and disbursements — more than $15,000,000 in construction draws and loans — into trust accounts controlled by Alison Pitkanen. Pitkanen was supposed to pay Sherwood's vendors. Instead she paid herself, she paid her relatives' debts, she withheld disbursements until her fees were satisfied, and she raided the job accounts for $331,256.96 to close a Holly Bluff transaction for Dixon's benefit. She has never accounted for a dollar of it.

The money Sherwood owed was structured to grow. Dixon's loans carried stated rates of 12% and 15%, a 2% origination fee, 1% renewal fees, due-diligence and collection charges, and a default rate at the statutory ceiling. Dixon deposited the loan proceeds in his own commercial accounts, earned bank interest on them, and charged Sherwood and its affiliates interest on the same funds. When the aggregate is computed as Florida law requires it to be computed, the rate is criminal.

The paper was false. Sherwood's own employee, Janelle Morea, was assigned to Pitkanen and made more than three dozen notarial attestations that signatories appeared before her when they did not. At a time when Morea held no remote-online-notary authorization at all, the signatures were electronic. Those instruments were recorded, filed in this court and in the state circuit courts, and sent to Sherwood's business partners.

This adversary proceeding is brought to recover what belongs to this estate and to its creditors: the escrowed funds Pitkanen still holds, the transfers that stripped Sherwood for the Defendants' benefit, the usurious charges Sherwood paid, and the damages the scheme caused. Sherwood's scheduled unsecured liabilities are $11,204,267.06. Its creditors are the subcontractors, suppliers, and vendors who performed work that Pitkanen's trust accounts were funded to pay.

## I. JURISDICTION, VENUE, AND STATUTORY PREDICATES

**This court has jurisdiction over this adversary proceeding.**

1. This adversary proceeding arises in and relates to the chapter 11 case of Sherwood Construction, Inc., Case No. 6:26-bk-05428-GER, pending in this court.

2. This court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and under the standing order of reference of the United States District Court for the Middle District of Florida.

3. Venue is proper in this district under 28 U.S.C. § 1409(a) because this proceeding arises in and relates to a case under title 11 pending in this district.

4. This proceeding is commenced under Federal Rules of Bankruptcy Procedure 7001(a) (recovery of money or property), 7001(b) (determination of the validity, priority, or extent of a lien or other interest in property), 7001(g) (injunctive or other equitable relief), 7001(h) (subordination of a claim), and 7001(i) (declaratory judgment).

**Sherwood states its position on core jurisdiction and consent under Rule 7008.**

5. Counts I through VII are core proceedings under 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (K), and (O). They concern the administration of the estate, the allowance and disallowance of claims against the estate, orders to turn over property of the estate, proceedings to determine, avoid, or recover fraudulent conveyances, the determination of the validity and extent of interests in property of the estate, and other proceedings affecting the liquidation of the assets of the estate and the adjustment of the debtor-creditor relationship.

6. Counts VIII through XX assert claims arising under nonbankruptcy law. Sherwood alleges that these counts are core because they are integral to the allowance or disallowance of the Defendants' claims against this estate and to the administration of the estate. See Wortley v. Bakst, 844 F.3d 1313, 1319 (11th Cir. 2017) (the question is "whether [it] stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process" (quoting Stern, 564 U.S.

at 499)). To the extent any count is determined to be non-core, Sherwood alleges in the alternative that it is a proceeding related to a case under title 11 within the meaning of 28 U.S.C. § 157(c).

7. Sherwood consents, under 28 U.S.C. § 157(c)(2) and Federal Rule of Bankruptcy Procedure 7008, to the entry of final orders and judgment by this court on all counts, including any count determined to be non-core and any count as to which this court would otherwise lack constitutional authority to enter final judgment under Stern v. Marshall, 564 U.S. 462 (2011). See Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 669, 685–86 (2015) (Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge).

8. Each Defendant is required to state in its responsive pleading whether it consents to the entry of final orders and judgment by this court. Fed. R. Bankr. P. 7012(b).

**Sherwood does not demand a jury trial and submits these claims to this court.**

9. Sherwood does not demand trial by jury on any count. By bringing these claims in this court as part of the administration of its estate, Sherwood invokes this court's equitable jurisdiction and waives any right to trial by jury that it might otherwise have had on any count pleaded in this complaint.

10. Every count is brought in aid of the administration of this estate, the marshaling of its assets, and the allowance, disallowance, and subordination of claims against it. All counts are triable to the court.

## II. PARTIES

**Sherwood is the debtor in possession and the plaintiff.**

11. Plaintiff Sherwood Construction, Inc. is a Florida corporation. It operated as a general contractor building residential and commercial projects, including affordable-housing

developments, for third-party owners. It ceased construction operations in 2024 and received its last revenue on October 14, 2024.

12. On July 20, 2026, three creditors filed an involuntary chapter 7 petition against Sherwood. Sherwood answered and consented to the entry of an order for relief on August 20, 2026, and moved to convert the case to chapter 11 under 11 U.S.C. § 706(a) on August 27, 2026. On September 8, 2026, this court entered the order for relief, granted the motion, and converted the case.

13. Sherwood continues in possession of its property and operates as debtor in possession under 11 U.S.C. §§ 1107 and 1108. No trustee or examiner has been appointed. Sherwood brings this action in its capacity as debtor in possession, with all of the rights, powers, and duties of a trustee under 11 U.S.C. § 1107(a), including those conferred by 11 U.S.C. §§ 323, 544, 550, and 551.

14. Sherwood's sole shareholder is Tiered Capital, Inc. Its sole director is Horton S. Johnson. Ross Johnston serves as its Chief Restructuring Officer. Martin C. Flynn, Jr. was Sherwood's President and a director until he resigned in July 2026.

**The Dixon defendants were the lender and the recipients of the transfers.**

15. Defendant Ken Dixon is an individual who resides in Osceola County, Florida, and who conducted the business alleged in this complaint in Orange and Brevard Counties, Florida. Dixon is a retired certified public accountant who made a fortune developing affordable housing and who describes himself as a hard-money lender.

16. Defendant PEDIXON, LLC is a limited liability company owned or controlled by Dixon that transacts business in Orange County, Florida. PEDIXON was the lender of record on the consolidated indebtedness and the recipient of transfers alleged in this complaint.

17. Defendant ZPD, LLC is a limited liability company owned or controlled by Dixon that transacts business in Orange County, Florida. ZPD was a funding and collection vehicle for the conduct alleged in this complaint and a recipient of transferred funds.

18. Defendant Parke Financial Limited Partnership is an entity owned or controlled by Dixon that transacts business in Orange County, Florida. Parke Financial was one of the lending, funding, and collection vehicles through which the conduct alleged in this complaint was carried out, and Sherwood alleges on information and belief that it advanced, received, or held funds arising from the Sherwood loans, the consolidated indebtedness, or the transfers described below. The precise extent of its participation is within the Defendants' exclusive knowledge and cannot be stated until the accounting sought in Count II is rendered.

19. Defendant Crescent Sound, Ltd. is an entity owned and controlled by Dixon. Crescent Sound was appointed trustee of the Tiered Land Trust on September 13, 2023, and in that capacity took control of assets and revenue streams alleged in this complaint.

**The Pitkanen defendants controlled Sherwood's money.**

20. Defendant Alison Pitkanen is a Florida attorney. She prepared all or most of the loan documents described in this complaint, controlled the escrow and disbursement of loan proceeds, and served as legal counsel to Sherwood and its affiliates while simultaneously serving the Dixon-related lenders.

21. Defendant Alison Pitkanen, P.A. is Pitkanen's professional association, organized under the laws of Florida. The trust accounts through which Sherwood's construction draws passed were maintained by or for Alison Pitkanen, P.A. The firm is liable for Pitkanen's conduct within the course and scope of her practice and is a transferee of funds belonging to Sherwood.

22. Ken Dixon, PEDIXON, LLC, ZPD, LLC, Parke Financial Limited Partnership, and Crescent Sound, Ltd. are referred to collectively in this complaint as the "Dixon defendants." Alison Pitkanen and Alison Pitkanen, P.A. are referred to collectively as the "Pitkanen defendants."

23. At all material times, each Defendant acted individually and as the agent, servant, employee, partner, joint venturer, or co-conspirator of each other Defendant, and within the course and scope of that relationship.

## III. FACTUAL ALLEGATIONS

**Sherwood was a forty-year general contractor destroyed by pandemic cost inflation.**

24. Sherwood had a forty-year history in the construction industry.

25. The COVID-19 pandemic created a construction environment that destroyed Sherwood. The pandemic prevented Canaveral Crossroads, LLC — the developer of the Cape Crossing Resort and Marina — from paying Sherwood approximately $3,600,000.

26. The pandemic drove the cost of labor and materials sharply higher. Those increases fell on five projects Sherwood had priced before the pandemic and was contractually bound to complete. Those five contracts generated more than $9,000,000 in losses.

27. By July 2024, Sherwood's operational losses exceeded $13,000,000, consisting of approximately $9,000,000 on the pre-pandemic contracts and approximately $3,600,000, plus interest, on the Cape Crossing contract.

28. From January 2022 through July 2024, in an effort to remain in business and complete its bonded work, Sherwood borrowed money from Ken Dixon.

29. In July 2024, the owner of Sherwood's last remaining project terminated the contract for the owner's convenience. Sherwood then ceased operations and began to wind up its affairs.

**Ken Jones put Sherwood in front of Dixon while serving as Sherwood's chief financial officer.**

30. Ken Jones is a personal friend of both Dixon and Martin C. Flynn, Jr. Jones served as chief financial officer for Flynn. Jones and Dixon are both retired certified public accountants.

31. During the period in which the loans described below were issued, Jones was the Chief Financial Officer of both Tiered Capital, Inc. and Sherwood Construction, Inc.

32. Jones introduced Dixon to Sherwood.

33. Jones conducted the due diligence on the loans and advised Dixon on each of them. Jones was Dixon's primary — and effectively exclusive — source of financial information about Sherwood.

34. Dixon performed no independent underwriting beyond the information Jones supplied, notwithstanding that Jones was a senior executive of the borrower and therefore stood on both sides of the transaction.

35. Sherwood alleges, and this estate is entitled to discovery to establish, that Jones's conflicted position was known to and exploited by Dixon and Pitkanen to obtain terms, collateral, and information advantages that an arm's-length lender dealing with an arm's-length borrower could not have obtained.

**Dixon made five loans to Sherwood totaling $2,750,000 on terms designed to compound.**

36. Between January 2022 and February 2023, Dixon and Dixon-controlled entities extended five loans to Sherwood:

(a) January 28, 2022 — the Sherwood note (Amelia certificate of deposit) — $500,000.00;

(b) August 3, 2022 — allonge to the Sherwood note — $250,000.00;

(c) October 1, 2022 — the Sherwood option loan — $500,000.00;

(d) December 13, 2022 — the million-dollar loan (Cherry certificate of deposit) — $1,000,000.00; and

(e) February 27, 2023 — the Resorts common-area loan — $500,000.00.

37. The five Sherwood loans totaled $2,750,000. Sherwood-affiliated sources repaid $150,000 within thirty days of the first advance.

38. Dixon did not evaluate these extensions of credit as conventional credit-based loans. He applied an asset-based model, assigning values to pledged collateral that in his view exceeded the cash advanced, and requiring collateral worth at least twice the amount lent.

39. Each loan carried a stated rate of interest of either 12% or 15% per annum.

40. Each loan required a 2% origination fee and 1% renewal fees.

41. Each loan contained provisions charging the borrower for collection costs, due-diligence expenses, and legal fees.

42. Upon default, the stated rate became the statutory maximum of 25% per annum, and the default provision made no allowance for the other charges that Florida law treats as interest.

43. The loans typically matured in one year and could be renewed on payment of a renewal fee.

44. Dixon deposited loan proceeds into commercial accounts in his own name, earned bank interest on those balances, and simultaneously charged the borrowers for the use of the same funds — collecting interest from both the bank and the borrower.

45. During the six-month period covering the last four Sherwood loans, it was apparent to Dixon, to Jones, and to Pitkanen that Sherwood was in a liquidity crisis.

**Sherwood placed its collections and disbursements under Pitkanen's control.**

46. In 2023, believing that new profitable contracts would allow it to earn its way out of its losses, Sherwood decided to place its collections and disbursements under the control of Alison Pitkanen.

47. The purpose was protective. Sherwood's remaining contracts were upside down because of pandemic price surges. Placing an attorney in a position of fiduciary care over the collection and disbursement of Sherwood's draws was intended to ensure that project money reached project vendors and that each job lost as little as possible.

48. Pitkanen established an IOLTA trust account for each remaining Sherwood construction contract.

49. Pitkanen collected the advances and draws for each job and was to disburse payments to the vendors and suppliers on that job.

50. The Pitkanen IOLTA accounts were also used to process the Dixon-Sherwood loans.

51. Pitkanen handled more than $15,000,000 of Sherwood money through those IOLTA accounts.

52. The funds in those accounts were Sherwood's property, held in trust for Sherwood and for the project vendors Sherwood was obligated to pay. Pitkanen and Alison Pitkanen, P.A. held those funds as fiduciaries and as escrow agents.

**Pitkanen diverted Sherwood's trust funds to herself, to her relatives, and to Dixon.**

53. Pitkanen misused and diverted a significant portion of the funds in Sherwood's job trust accounts.

54. Pitkanen covered a $500,000 shortfall in the funding of the Holly Bluff Marina acquisition — a transaction to which Sherwood was not a party and from which Sherwood received no compensation — by an unauthorized use of funds held in Sherwood's job-specific trust accounts.

55. Specifically, Pitkanen took $331,256.96 from Sherwood's disbursing accounts to complete the Holly Bluff closing. She did so without the approval of Sherwood, of the sellers, or of the buyers.

56. Pitkanen made payments on her relatives' debts out of funds under her control before paying project costs.

57. Pitkanen held disbursements hostage — conditioning or withholding the release of Sherwood's construction draws — in order to collect her own fees, notwithstanding that project-specific vendors were waiting to be paid.

58. Pitkanen made substantial disbursements to herself ahead of senior creditors from Sherwood's monies.

59. Pitkanen and her firm operated under a compensation arrangement approximating $240,000 per year, payable from whichever entity or transaction in the group was in a position to pay, including Sherwood.

60. As liquidity tightened, Pitkanen recognized that Dixon's loan proceeds and the escrowed funds under her control represented the most reliable source from which her compensation could be satisfied, and she conducted herself accordingly.

61. By controlling the flow of loan proceeds, Dixon could control the flow of funds to Pitkanen, and thereby gain influence over the borrowers' legal representation, over the transactional documentation, and over the enforcement posture taken against Sherwood and its affiliates.

62. Pitkanen has never produced a statement of accounting for her fees or for her disbursements of Sherwood's funds.

63. On information and belief, and as reflected in the Debtor's case management summary filed in this case, Pitkanen and Alison Pitkanen, P.A. continue to hold not less than $288,000 of escrowed funds belonging to Sherwood arising out of the Holly Bluff loan closing.

64. Sherwood is unable to state the full amount diverted because the Defendants have never provided an accounting. The amounts alleged in this section are the amounts presently identifiable from Sherwood's own records and are pleaded without prejudice to amendment when the accounting sought in Count II is rendered.

**A Sherwood employee was used to improperly notarize documents.**

65. Janelle Morea was an employee of Sherwood.

66. Although a Sherwood employee, Morea was tasked to serve as Pitkanen's assistant, and she became a close personal friend of Pitkanen. Morea worked for Pitkanen on many matters, including matters wholly unrelated to Sherwood, and continued to assist Pitkanen after leaving Sherwood's employment.

67. Pitkanen ensured that the transactions described in this complaint were closed without the parties meeting at the same time in the same place.

68. Pitkanen caused Morea to execute numerous false notarial certificates attesting that signatories were physically present before her when they were not.

69. Between January 2022 and September 2024, there were more than thirty-four false attestations and other notarization irregularities on instruments in this group of transactions.

70. On February 27, 2022, Pitkanen sent an email stating that Morea "was going to get licensed for electronic certification to make closings easier." That email establishes Pitkanen's awareness that remote online notarization requires separate authorization.

71. Under Florida Statutes §§ 117.201(10) and 117.225, a notary must register separately with the Department of State before performing remote online notarizations, and only a registered online notary may perform them.

72. According to Florida Department of State records, Morea did not obtain remote-online-notary authorization until September 2025 — more than three years after Pitkanen's email.

73. Morea notarized at least three dozen signatures between January 2022 and September 2024, during which period she held no remote-online-notary authorization.

74. Under Florida law, instruments bearing those certificates have lost their presumption of correctness.

75. Morea was required to maintain a notarial bond under Fla. Stat. § 117.01(7)(a) and, after her registration as an online notary public, a bond in the penal sum of $25,000 under Fla. Stat. § 117.225(6). Sherwood's claim against the surety on each bond in force when the notarizations alleged in this complaint were made is an asset of this estate.

76. Because Morea was Sherwood's employee, the Defendants' use of her created exposure for Sherwood and impaired the integrity of instruments to which Sherwood was a party or a guarantor.

77. The Florida Supreme Court has disciplined attorneys for allowing, directing, or acquiescing in notarial misconduct of the kind alleged here. See, e.g., The Florida Bar v. Farinas, 608 So. 2d 22, 23–24 (Fla. 1992).

**The September 2023 consolidation purported to make Sherwood a guarantor of $11,075,000.**

78. By September 2023, eleven extensions of credit remained outstanding across Dixon's borrowers, with an aggregate balance of $11,075,000. Five of those eleven were the Sherwood loans.

79. On September 14, 2023, a Consolidated Loan Agreement for Tiered Capital, Inc. was executed. The total consolidated loan amount was $11,075,000.

80. Pitkanen drafted the consolidated documents. She drafted default-interest provisions designed to escalate interest on default to the statutory maximum, and she disguised additional interest as other categories of charges.

81. The consolidated documents provided for cross-collateralization of collateral contributed by four settlors and grantors.

82. The consolidated documents recited guarantees from twelve additional guarantors, including Sherwood Construction, Inc.

83. The guarantees were signed by the individual guarantors in their individual capacities only. They were not executed on behalf of the corporate and limited-liability entities named as guarantors, including Sherwood.

84. The guaranty on which the Defendants rely as to Sherwood bears a single signature line. Beneath that one line, the signature block lists Martin C. Flynn, Jr. individually and then, in a stacked list, several entities, including Sherwood. There is no separate signature line, and no separate signing, for Sherwood or for any of the other listed entities.

85. Each entity listed in a signature block must be separately signed for in order to be bound. A single signature on a single line binds only the signer named on that top line — here, Mr. Flynn individually — and does not bind the entities listed beneath it.

86. No officer or director of Sherwood executed a guarantee of the consolidated indebtedness on Sherwood's behalf, and no corporate authorization for any such guarantee exists.

87. Sherwood received no consideration for the purported guarantee. It received no loan proceeds from the consolidation, no forbearance of its own obligations, and no release. The consolidation transferred nothing of value to Sherwood.

88. The Consolidated Loan Agreement provided for $750,000 in new funds, of which half was designated for an interest reserve and half for disbursement by Pitkanen. None of it was designated for, or delivered to, Sherwood.

89. Section 6.2 of the Consolidated Loan Agreement required that the proceeds be disbursed to pay outstanding association dues and real estate taxes, to bring first-mortgage payments current, and to deliver $89,000 to the closing attorney for outstanding amounts related to the Holly Bluff purchase.

90. The lender, through Pitkanen as closing attorney, maintained exclusive control over disbursement of the proceeds.

91. The proceeds were not disbursed as agreed. Funds were diverted from their stated purposes and routed to Dixon-affiliated entities and to accounts not specified in the agreed disbursement schedule.

**Dixon and Pitkanen engineered the Holly Bluff closing with Sherwood's money.**

92. Pitkanen's official Holly Bluff closing documents recited that Dixon lent $3,000,000.

93. Pitkanen's second set of records reveals that Dixon in fact advanced $2,754,031.59.

94. Pitkanen covered the difference by raiding Sherwood's disbursing accounts for $331,256.96.

95. Even after that raid, the closing was underfunded. Pitkanen represented that she had retained more than $100,000 in her trust account for prorations when there was no money in the account.

96. At the closing, Pitkanen caused the stock of Holly Bluff Marina, Inc. to be transferred to A Marine, Inc., and caused Holly Bluff to quitclaim its most valuable asset — 7.24 acres of riverfront real estate — to PEDIXON, LLC.

97. The result was that PEDIXON owned real estate appraised at $4,210,000 and simultaneously held a $3,000,000 note, on which it collected $37,500 per month for approximately twenty months, for which PEDIXON paid nothing.

98. Sherwood was not a party to the Holly Bluff transaction. Sherwood received no compensation although the transaction was funded by Sherwood.

99. The $331,256.96 taken from Sherwood's job accounts was a transfer of an interest of Sherwood in property, made without Sherwood's authorization, for the benefit of Dixon, PEDIXON, and Pitkanen, and for which Sherwood received no value whatever.

**Dixon's certificate of deposit backed Sherwood's Cherry Village letter of credit, and the fallout was blamed on Sherwood's president.**

100. In 2022, Jones arranged a transaction under which Dixon would provide Sherwood with $1,000,000 of credit support to back a letter of credit, which Sherwood would use in lieu of a payment bond on the Cherry Village project.

101. Dixon made the loan by means of a certificate of deposit. The certificate of deposit was owned by Dixon and was signed by Dixon.

102. Dixon pledged the certificate of deposit to First State Bank of the Florida Keys.

103. On December 14, 2022, in reliance on that pledge, First State Bank of the Florida Keys issued Irrevocable Letter of Credit No. 154-1214 for the account of Sherwood Construction, Inc., in the amount of $1,008,673.80, with Walker & Dunlop, LLC as beneficiary.

104. In December 2023, the letter of credit came up for renewal and the bank required new documents.

105. Pitkanen advised that Dixon should not renew.

106. Dixon and Pitkanen were warned that the project owner would draw on the letter of credit before the January 13, 2024 deadline if Dixon did not renew; that on payment of the draw First State would take the certificate of deposit under the documents Dixon had signed; and that the combination would trigger a termination of Sherwood's contract for cause.

107. Termination for cause would have been catastrophic for Sherwood, which had spent several million dollars more than it had been paid and had performed substantial work outside the contract that would be difficult to collect if the contract were terminated for cause.

108. Dixon renewed both the certificate of deposit and the assignment of the pledge to First State Bank.

109. In July 2024, Cherry Village, L.P. cancelled the Sherwood construction contract under the contract's termination-for-convenience provision.

110. In August 2024, Walker & Dunlop drew on the letter of credit. Sherwood did not approve the draw. First State Bank took the certificate of deposit.

111. The unpaid draw and retainage owed to Sherwood exceed the remaining vendor claims on the project, yet Walker & Dunlop has refused to release funds to Sherwood or to Dixon.

112. Pitkanen and Dixon then stated to third parties that Sherwood's president, Martin C. Flynn, Jr., had stolen the money — a statement they knew to be false, since the certificate of deposit was Dixon's own, pledged by Dixon, and taken by the bank.

113. That false narrative was published to lenders, sureties, business partners, and others with whom Sherwood did business, and it impaired Sherwood's ability to collect its receivables and to resolve its remaining project claims.

**The Defendants manufactured defaults and charged criminally usurious interest.**

114. In or about January 2024, Dixon and Pitkanen declared or manufactured defaults across the loans in order to trigger the default-interest provisions.

115. Dixon then charged default interest at or near 25% per annum, while selectively offsetting certain "late charges" so that the stated rate would appear to fall below the statutory ceiling.

116. Those offsets did not account for the additional interest embedded in the loan structure: origination fees, renewal fees, excessive due-diligence charges, contractual attorney-fee provisions, and the bank interest Dixon earned on loan proceeds held in his own accounts while charging the borrowers for the use of the same funds.

117. Under Florida law, all compensation for the use, forbearance, or detention of money is interest, whatever it is called. See Fla. Stat. § 687.03(1), (3).

118. Computed as Florida law requires, the effective rate exceeded 25% per annum. For calendar year 2024, on an effective principal balance of $8,150,000, interest billed and collected was $2,634,653.62 against a lawful maximum of $2,037,500.00 — an excess of $597,153.62 and an effective rate of 32.33%. For calendar year 2025, on an effective principal balance of

$5,150,000, interest billed and collected was $1,498,825.83 against a lawful maximum of $1,287,500.00 — an excess of $211,325.83 and an effective rate of 29.10%.

119. The excess charged over the two years was not less than $808,479.45 on aggregate interest of $4,133,479.45.

120. If the in-kind payments received by Dixon were credited when received — the Holly Bluff riverfront real estate on or about July 20, 2023, valued at $4,210,000, and the Hampton, South Carolina property in July 2023, valued at $4,300,000 — then the loans became criminally usurious no later than October 2023. Crediting even the lesser figures Dixon himself used renders all eleven outstanding loans criminally usurious no later than February 2024.

121. The Sherwood loans were among the obligations on which those rates were charged and collected, directly and through the consolidation.

122. Willfully and knowingly charging, taking, or receiving interest in excess of 25% per annum is criminal usury under Fla. Stat. § 687.071(2) and (3). An extension of credit made in violation of that section is not an enforceable debt, and the lender can enforce neither principal nor interest. Fla. Stat. § 687.071(7). The lender also forfeits the interest charged and double the interest taken or reserved. Fla. Stat. § 687.04.

123. Sherwood alleges that the Sherwood loans, the purported Sherwood guarantee, and any claim asserted against this estate arising from either are void and unenforceable in whole.

**The Defendants have never provided an accounting to Sherwood.**

124. Florida law requires an unlicensed lender to provide the borrower with a signed receipt identifying how each payment received has been applied — what portion to principal, what portion to interest, and what portion to fees or other charges.

125. Dixon never provided a receipt or an accounting for any payment received from Sherwood or on Sherwood's account.

126. Sherwood and its affiliates have repeatedly sought an accounting — directly, through agents, and through counsel — of all payments made and all amounts received by Dixon and his affiliated entities.

127. Neither Dixon nor any of his agents, employees, or affiliated companies has ever accounted for the payments received, whether in cash, in kind, or in property.

128. Pitkanen has never rendered an accounting of the more than $15,000,000 of Sherwood construction draws that passed through her trust accounts, of her disbursements from those accounts, or of the fees she took from them.

129. The accounts between Sherwood and the Defendants are complicated. Proceeds were commingled, value was taken in cash and in kind, funds were routed through multiple entities and multiple trust accounts, and the Defendants continue to hold funds belonging to this estate. The amounts owed cannot be determined without a full accounting.

**Crescent Sound took the trust property, collected its rents, and paid its owner first.**

130. On September 13, 2023, a Tiered Land Trust Agreement was executed naming Crescent Sound, Ltd. — an entity owned and controlled by Dixon — as trustee. The trust property consisted of all of the issued and outstanding stock of Holly Bluff Marina, Inc. and twenty-six condominium and townhome units at the Cape Crossing Resort & Marina in Brevard County, Florida, together with other personal property assigned into the trust.

131. The trust agreement named four beneficiaries: Homemakers Real Estate, LLC, as to the Cape Crossing units; A Marine, Inc., as to the stock of Holly Bluff Marina, Inc.; Yaniv

Amar, as to the shares of Recycled Group of South Carolina, LLC; and Tiered Capital, Inc., as to the shares of Cape Crossing Vacation Rentals, LLC.

132. The Tiered Land Trust is not a land trust governed by Fla. Stat. § 689.071. A land trust under that section is a trust of land, under which title to real property is vested in a trustee whose duties are limited to those enumerated in § 689.071(2)(c). The corpus of the Tiered Land Trust includes corporate stock and limited-liability-company interests, which are not real property, and the trustee's duties under the agreement and the written directions given under it exceed the limited duties the statute permits.

133. The Tiered Land Trust was created on September 13, 2023. Under Fla. Stat. § 689.071(12)(c), a trust created on or after June 28, 2013 is a land trust governed by § 689.071 only if the trustee's duties are no greater than those limited duties. Because the trustee's duties exceed them, the Tiered Land Trust is not governed by § 689.071, and chapter 736 applies to it as an express trust. Fla. Stat. § 736.0102(1), (3). The Tiered Land Trust is an express trust governed by the Florida Trust Code, and Crescent Sound is subject to the duties the Code imposes on a trustee.

134. The trust agreement provides that, "upon receipt of written instructions from the Beneficiaries, Trustee must manage and execute the Trust Property accordingly."

135. On September 14, 2023, beneficiaries constituting 100% of the beneficial interests delivered written Joint Beneficiary Instructions to the trustee. The instructions directed the sale of two Cape Crossing units each month to satisfy the scheduled debts, declared the beneficiaries' intention to pay off the indebtedness under the loan agreement executed that day, gave notice that the first mortgages on the units would be timely paid, and "authorized and directed" the trustee "to take the necessary action to effectuate this plan."

136. The Consolidated Loan Agreement executed the same day required that the first mortgages on the units be timely paid even if the rents collected were insufficient, and entitled the lender to the first rental monies received, in weekly installments of $25,000.

137. Beginning in December 2023, the rental revenue generated by the trust units was paid to Crescent Sound rather than to Homemakers Real Estate, LLC. The property manager's payout reconciliation for December 2023 records $55,488.97 paid to Crescent Sound for that month alone.

138. The distributions of that rental revenue recorded between January 30 and September 12, 2024 total not less than $687,440.15. Those distributions were credited against the interest the Dixon defendants charged on the consolidated indebtedness. Crescent Sound, the trustee, thus paid the rents of the trust property to its own owner and controller.

139. Crescent Sound did not apply the rents it received to the first mortgages, real-estate taxes, or condominium and homeowners' association assessments on the trust units. Mortgage holders, associations, and the Brevard County Tax Collector commenced foreclosure and enforcement proceedings against the units as a result.

140. On information and belief, Crescent Sound did not sell two units each month as directed, and did not otherwise carry out the plan it was directed to effectuate.

141. A mortgage holder obtained a state-court order directing PEDIXON and Crescent Sound to deposit unit revenues into the registry of the court. On information and belief, they did not comply.

142. On March 17, 2025, the settlors revoked their grants to the trust, and the holders of the power of direction removed Crescent Sound as trustee. The removal was recorded in the public

records of Brevard County. Crescent Sound disregarded both, and continued to hold the trust property and collect its revenues.

143. Crescent Sound has never rendered an accounting of the trust property, the rents it received, or their disposition.

144. The Dixon defendants have asserted, in this court and elsewhere, that by an assignment dated January 9, 2024, all of the membership interests of Homemakers Real Estate, LLC were transferred to Crescent Sound as trustee. Taking that assertion on its own terms, Crescent Sound, acting through Dixon, was from that date the sole member in control of Homemakers.

145. From at least January 2024, Homemakers was not paying its debts as they came due and was insolvent. The entities whose property Crescent Sound held, and whose revenues it collected, were insolvent while it held and collected them.

146. Sherwood is a creditor of Homemakers and a secured party. By a Subrogation Agreement effective January 3, 2023, Sherwood subrogated $150,000 of certificate-of-deposit collateral supporting its letters of credit in exchange for the proceeds of the sale of a Cape Crossing unit to Homemakers, and a UCC-1 financing statement was filed securing that interest.

147. Sherwood is also a guarantor of the consolidated indebtedness for which the trust property was the principal collateral. By diverting the rents away from the first mortgages, taxes, and assessments, and by failing to sell units as directed, Crescent Sound exposed that collateral to foreclosure and impaired its value, and so increased the exposure of every guarantor, including Sherwood.

**Related litigation against these Defendants is pending in the state circuit court.**

148. On July 9, 2026, Horton Johnson and Tiered Capital, Inc. filed a Verified Complaint for Damages, Request for Equitable Relief and Demand for Jury Trial in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, against Kenneth Dixon, PEDixon, LLC, ZPD, LLC, Parke Financial, Ltd., Alison Pitkanen, Alison Pitkanen, P.A., and Crescent Sound, Ltd. (the "State Court Action"). The State Court Action was filed eleven days before the involuntary petition was filed against Sherwood.

149. Sherwood is neither a plaintiff nor a defendant in the State Court Action. Sherwood does not adopt, join in, or take any position on the claims pleaded there, which are pleaded by other parties on their own behalf.

150. The claims asserted in this adversary proceeding belong to this estate. They arise from injuries to Sherwood — the diversion of Sherwood's construction draws from the trust accounts established for its own jobs, the interest and charges imposed on the five Sherwood loans, the purported guarantee of the consolidated indebtedness, the certificate of deposit securing Sherwood's letter of credit, and the use of Sherwood's own employee to execute notarized documents.

151. The complaint filed in the State Court Action pleads, at its paragraphs 80 through 98, the facts concerning Pitkanen's control of Sherwood's collections and disbursements, the IOLTA trust accounts she established for each Sherwood construction contract, the more than $15,000,000 of Sherwood money that passed through those accounts, and her diversion of a significant portion of those funds. It pleads, at its paragraphs 116 through 121, that Pitkanen obtained the Holly Bluff closing proceeds by raiding Sherwood's disbursing accounts for $331,256.96 without Sherwood's approval.

152. Those allegations are incorporated by reference into the State Court Action's counts for conversion, breach of fiduciary duty, civil theft, accounting, and racketeering. Its breach-of-fiduciary-duty count alleges that Pitkanen owed fiduciary duties as "attorney for and escrow agent for Tiered's subsidiary Sherwood Construction holding and disbursing funds in her IOLTA trust accounts," and seeks damages including "the loss of escrowed funds." Its conversion and civil theft counts identify "escrowed funds held by Pitkanen" among the property allegedly taken.

153. Those are Sherwood's injuries. The funds in the Sherwood job trust accounts were Sherwood's property. The $331,256.96 was taken from Sherwood's disbursing accounts. The vendors who went unpaid were Sherwood's vendors, and their claims are now filed against this estate.

154. Under Florida law, a claim for injury to a corporation belongs to the corporation and not to its shareholders, and a shareholder — including a sole shareholder — may not sue in its own name to recover for an injury suffered by the corporation. Tiered Capital, Inc. is Sherwood's sole shareholder. Any claim arising from the diversion of Sherwood's trust-account funds is Sherwood's, and Tiered's loss is derivative of its equity position.

155. On the petition date, every such claim became property of this estate under 11 U.S.C. § 541(a)(1). Sherwood, as debtor in possession, holds the exclusive right to prosecute, settle, compromise, or release those claims, and any recovery on them belongs to this estate and to its creditors.

156. Sherwood alleges these facts so that this court is apprised of the related proceeding and of the overlap. Sherwood reserves all rights with respect to the State Court Action, including the right to seek removal under 28 U.S.C. § 1452(a) and Federal Rule of Bankruptcy Procedure

9027, transfer, consolidation, abstention, relief under 11 U.S.C. § 362(a)(3) as to any act to exercise control over property of the estate, and the entry of orders coordinating discovery.

**Sherwood's creditors bear the loss.**

157. Sherwood's scheduled liabilities are general unsecured claims of $11,204,267.06. No creditor holds a lien on Sherwood's property.

158. Those liabilities include $1,907,394.83 of trade, vendor, and service claims ($1,539,272.58 of which are disputed) — the subcontractors and suppliers whose invoices the Pitkanen trust accounts were funded to pay — $5,017,029.24 of disputed debts, and $4,279,842.99 of notes, loans, and advances.

159. The disputed debts, as scheduled in Part 2.2 of Sherwood's Schedule E/F, are:

(a) Trent — Cherry Village Note — $1,345,726.29;

(b) Martin C. Flynn, Jr. — $1,272,762.75;

(c) Trent — Eustis Note — $1,018,700.83;

(d) Joanna G. Bornmiller — $713,136.18;

(e) Pitkanen / Lagenhoff — $277,494.00;

(f) Ebenezer Stone, LLC — $253,824.91;

(g) John Abell — $55,630.77;

(h) Endless Management Construction — $29,867.75;

(i) United Healthcare — $24,887.00;

(j) Garcia Brothers Construction — $14,000.00;

(k) Colony Insurance Company — $10,998.76; and

(l) Christian's Lawn Service, LLC; Duval Master Construction; G&R Windows; Reyes Construction; and Cortez — each listed for notice at $0.00.

160. Sherwood has no cash, no bank accounts, no inventory, no equipment, and no real property. Its assets consist of claims against third parties, including the claims asserted in this complaint.

161. Every dollar recovered in this adversary proceeding is a dollar available for distribution to holders of allowed general unsecured claims under a chapter 11 plan of liquidation.

## IV. CLAIMS FOR RELIEF

### COUNT I — TURNOVER OF PROPERTY OF THE ESTATE

### 11 U.S.C. § 542(a) and, in the alternative, § 542(b)

### (Against Alison Pitkanen and Alison Pitkanen, P.A.)

162. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 52 through 64.

163. The funds deposited into the IOLTA trust accounts Pitkanen established for each Sherwood construction contract were and are property of Sherwood and, upon the commencement of this case, became property of this estate under 11 U.S.C. § 541(a).

164. Pitkanen and Alison Pitkanen, P.A. are entities in possession, custody, or control of property of the estate that the Debtor may use, sell, or lease under 11 U.S.C. § 363.

165. Those Defendants hold not less than $288,000 in escrowed funds arising from the Holly Bluff loan closing, and hold or are accountable for such additional sums as the accounting sought in Count II will establish.

166. In the alternative, those Defendants owe the estate matured debts, payable on demand, consisting of Sherwood funds received and not disbursed for Sherwood's benefit, which are property of the estate subject to turnover under 11 U.S.C. § 542(b).

167. The property is not of inconsequential value or benefit to the estate. It is a principal source of distribution to Sherwood's unsecured creditors.

168. Sherwood has demanded turnover and the Defendants have refused or failed to deliver the property.

WHEREFORE, Sherwood demands judgment against Alison Pitkanen and Alison Pitkanen, P.A. compelling the immediate turnover to the estate of all property of the estate in their possession, custody, or control under 11 U.S.C. § 542(a) or, in the alternative, payment to the estate of the debts owed to it under 11 U.S.C. § 542(b), together with prejudgment interest, costs, and such other relief as is just.

**COUNT II — ACCOUNTING**

**(Against All Defendants)**

169. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 52 through 64 and 124 through 129.

170. A fiduciary and trust relationship existed between Sherwood and Pitkanen and Alison Pitkanen, P.A. arising from Pitkanen's role as Sherwood's attorney, as escrow agent, and as the person in exclusive control of the collection and disbursement of Sherwood's construction draws.

171. A relationship requiring an accounting also exists as to the Dixon defendants, who were lenders in control of the disbursement of proceeds, who took payments in cash and in kind, who never credited those payments, and who were and are required by law to deliver a receipt identifying the application of each payment.

172. More than $15,000,000 of Sherwood's money passed through Pitkanen's trust accounts. The Defendants commingled proceeds, routed funds through multiple entities and accounts, and took value in cash, in property, and in equity interests.

173. The accounts between the parties are so complicated that the amounts owed cannot be determined without a full accounting.

174. Sherwood's remedy at law is inadequate without an accounting, because Sherwood cannot state the full measure of its claims until the Defendants disclose what they received and what they did with it.

WHEREFORE, Sherwood demands judgment ordering each Defendant to render a full and complete accounting of all Sherwood funds received, held, disbursed, applied, and retained, of all fees taken, and of all payments received on the Sherwood loans whether in cash, in kind, or in property; awarding judgment for all sums shown due on the accounting; imposing a constructive trust over the identified funds and their traceable proceeds; and granting such other relief as is just.

**COUNT III — AVOIDANCE OF FRAUDULENT TRANSFERS**

**11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105, 726.106, and 726.108**

**(Against All Defendants)**

175. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 45 through 99.

176. There exists at least one creditor holding an allowable unsecured claim against Sherwood who could, under applicable nonbankruptcy law, avoid the transfers described in this complaint. Sherwood's scheduled trade, vendor, and service creditors hold such claims, and those claims arose before and during the period of the transfers.

177. Sherwood therefore may avoid those transfers and obligations under 11 U.S.C. § 544(b), exercising the rights of such a creditor under the Florida Uniform Fraudulent Transfer Act, Fla. Stat. ch. 726.

178. Under Fla. Stat. § 726.110(1) and (2), a transfer or obligation is avoidable if the action is brought within four years after the transfer was made or the obligation was incurred or, for a transfer made with actual intent, within one year after the transfer or obligation was or reasonably could have been discovered, if later. Measured from the petition date of July 20, 2026, the four-year period reaches every transfer made and every obligation incurred on or after July 20, 2022.

179. The transfers and obligations within that period include, without limitation: (a) the Sherwood loans extended on and after August 3, 2022, and the obligations Sherwood incurred on them; (b) the $331,256.96 taken from Sherwood's job-specific disbursing accounts in July 2023 to fund the Holly Bluff closing; (c) the funds diverted from the Sherwood job trust accounts to Pitkanen, to Alison Pitkanen, P.A., and to the Dixon defendants during 2023 and thereafter; (d) the fees Pitkanen paid herself from Sherwood's funds; and (e) the purported guarantee of the $11,075,000 consolidated indebtedness dated September 14, 2023.

180. As to any transfer or obligation made or incurred before July 20, 2022, including the January 28, 2022 Sherwood note, the transfer was concealed, was not discovered and could not reasonably have been discovered by Sherwood until within one year before the petition date, and, as a transfer made or obligation incurred with actual intent under Fla. Stat. § 726.105(1)(a), is avoidable under the discovery provision of Fla. Stat. § 726.110(1).

181. The Defendants caused Sherwood to make or incur those transfers and obligations with actual intent to hinder, delay, or defraud Sherwood's creditors, within the meaning of Fla.

Stat. § 726.105(1)(a). The intent of the Defendants, who dominated Sherwood's disbursement function through Pitkanen's control of the job trust accounts, is chargeable to the transfers.

182. The badges of fraud attending the transfers, see Fla. Stat. § 726.105(2), include: the transfers were to or for the benefit of insiders and controlling parties; Sherwood retained no benefit; the transfers were concealed from Sherwood and from its creditors; Sherwood was insolvent or became insolvent shortly after the transfers were made; the value of the consideration was not reasonably equivalent; and the transfers were effected through instruments bearing false notarial certificates.

183. In the alternative, Sherwood received less than a reasonably equivalent value in exchange for the transfers and obligations. As to the purported guarantee of the consolidated indebtedness, Sherwood received no value at all: no proceeds, no forbearance of its own obligations, and no release. At the time of each transfer and obligation, Sherwood was engaged in a business for which its remaining assets were unreasonably small, or intended to incur or reasonably should have believed it would incur debts beyond its ability to pay as they became due, within the meaning of Fla. Stat. § 726.105(1)(b).

184. In the further alternative, the transfers were made and the obligations incurred without Sherwood receiving a reasonably equivalent value at a time when Sherwood was insolvent or became insolvent as a result, within the meaning of Fla. Stat. § 726.106(1). Sherwood's pandemic-era losses on its pre-pandemic contracts and its unpaid Cape Crossing receivable had rendered it insolvent by 2023.

185. This action is brought within the period allowed by Fla. Stat. § 726.110 and within the period allowed by 11 U.S.C. § 546(a).

WHEREFORE, Sherwood demands judgment avoiding the transfers and obligations described above under 11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105, 726.106, and 726.108, preserving them for the benefit of the estate under 11 U.S.C. § 551, and granting such other relief as is just.

**COUNT IV — RECOVERY OF AVOIDED TRANSFERS**

**11 U.S.C. §§ 550 and 551**

**(Against All Defendants)**

186. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein.

187. The transfers and obligations described in Count III are avoidable under 11 U.S.C. § 544(b).

188. Each Defendant is an initial transferee of an avoided transfer, the entity for whose benefit an avoided transfer was made, or an immediate or mediate transferee of an initial transferee.

189. No Defendant took for value, in good faith, and without knowledge of the voidability of the transfer. Each Defendant had actual knowledge of the facts making the transfers avoidable; indeed, the Defendants designed the transactions.

190. Sherwood is entitled to recover the property transferred, or the value of that property, from each such Defendant for the benefit of the estate under 11 U.S.C. § 550(a), and each avoided transfer is preserved for the benefit of the estate under 11 U.S.C. § 551.

WHEREFORE, Sherwood demands judgment against each Defendant for the property transferred or the value of that property, together with prejudgment interest and costs, and such other relief as is just.

## COUNT V — DISALLOWANCE OF CLAIMS

## 11 U.S.C. §§ 502(b)(1) and 502(d)

## (Against PEDIXON, LLC, ZPD, LLC, and Parke Financial Limited Partnership)

191. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 91 through 123.

192. To the extent any Defendant has filed or asserts a claim against this estate, that claim is unenforceable against Sherwood and against property of Sherwood under applicable law and under any agreement, and is therefore disallowed under 11 U.S.C. § 502(b)(1).

193. The claims are unenforceable because the underlying obligations are criminally usurious and not enforceable under Fla. Stat. § 687.071(7); because the purported Sherwood guarantee was never executed by Sherwood, was never authorized by Sherwood, and was unsupported by consideration; because the instruments relied upon bear false notarial certificates and have lost their presumption of correctness; and because the Defendants have never accounted for the payments received in cash, in kind, and in property, which exceed any amount advanced.

194. Separately and independently, each Defendant is an entity from which property is recoverable under 11 U.S.C. §§ 542 and 550, and is a transferee of transfers avoidable under 11 U.S.C. § 544(b), that has not turned over that property or paid the amount for which it is liable.

195. The claim of each such Defendant must therefore be disallowed in its entirety under 11 U.S.C. § 502(d) until that Defendant turns over the property or pays the amount for which it is liable.

WHEREFORE, Sherwood demands judgment disallowing in its entirety each claim asserted against this estate by any Defendant, and granting such other relief as is just.

## COUNT VI — EQUITABLE SUBORDINATION

## 11 U.S.C. § 510(c)

**(Against Ken Dixon, PEDIXON, LLC, ZPD, LLC, Parke Financial Limited Partnership, Crescent Sound, Ltd., Alison Pitkanen, and Alison Pitkanen, P.A.)**

196. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 45 through 123.

197. Each Defendant engaged in inequitable conduct toward Sherwood and its creditors, including: obtaining and administering the loans through Sherwood's own conflicted chief financial officer; taking control of Sherwood's collection and disbursement function and then diverting the funds in it; charging criminally usurious interest; manufacturing defaults; using false notarial certificates on instruments affecting Sherwood; and paying the controlling parties ahead of the project vendors the trust accounts existed to pay.

198. Alison Pitkanen occupied a position of control over Sherwood's finances and owed Sherwood fiduciary duties. She and her firm are insiders of Sherwood in fact within the meaning of 11 U.S.C. § 101(31)(B), and their conduct is measured by the heightened standard applicable to fiduciaries and insiders.

199. That conduct resulted in injury to Sherwood's creditors and conferred an unfair advantage on the Defendants, who took Sherwood's money ahead of the subcontractors and suppliers who had performed the work.

200. Equitable subordination of the Defendants' claims is consistent with the provisions and purposes of the Bankruptcy Code.

WHEREFORE, Sherwood demands judgment subordinating each claim asserted by any Defendant to all allowed claims of all other creditors of this estate, transferring to the estate any lien securing any such claim under 11 U.S.C. § 510(c)(2), and granting such other relief as is just.

**COUNT VII — DECLARATORY JUDGMENT**

**28 U.S.C. §§ 2201–2202; Fed. R. Bankr. P. 7001(i)**

**(Against All Defendants)**

201. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 91 through 123.

202. An actual, present, and justiciable controversy exists between Sherwood and the Defendants concerning the validity and enforceability of the Sherwood loans, of the purported Sherwood guarantee of the Consolidated Loan Agreement, and of the instruments executed in connection with them.

203. Sherwood is in doubt as to its rights and obligations and requires a declaration of them in order to propose and confirm a plan of liquidation and to distribute the proceeds of its claims to its creditors.

WHEREFORE, Sherwood demands judgment declaring that:

(a) the Sherwood loans and the consolidated indebtedness are criminally usurious and not enforceable debts under Fla. Stat. § 687.071(7), that the Defendants may enforce neither principal nor interest, and that the Defendants forfeit all interest under Fla. Stat. § 687.04;

(b) Sherwood did not execute, authorize, or ratify any guarantee of the Consolidated Loan Agreement, and that no such guarantee is enforceable against Sherwood or this estate;

(c) any guarantee, assignment, pledge, or security instrument purporting to bind Sherwood that bears a notarial certificate executed by Janelle Morea between January 2022 and September 2024 is void, is without presumption of correctness, and is cancelled;

(d) all funds deposited into the IOLTA trust accounts established for Sherwood's construction contracts, and all traceable proceeds of those funds, are property of this estate; and

(e) the Defendants hold no valid claim against Sherwood or against property of this estate;

together with such further relief, including supplemental relief under 28 U.S.C. § 2202, as is just.

**COUNT VIII — CRIMINAL USURY AND FORFEITURE**

**Fla. Stat. §§ 687.071, 687.04, and 687.03**

**(Against Ken Dixon, PEDIXON, LLC, ZPD, LLC, and Parke Financial Limited Partnership)**

204. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 45 through 45 and 92 through 123.

205. The Defendants knowingly and willfully charged, took, received, reserved, and contracted to receive interest on the Sherwood loans and on the consolidated indebtedness at a rate exceeding 25% per annum.

206. The interest so charged included not only the stated rate but the origination fees, renewal fees, due-diligence charges, collection charges, contractual attorney-fee provisions, forbearance consideration, and the bank interest the Defendants earned on loan proceeds held in their own accounts while charging Sherwood for the use of the same funds. All of it is interest. See Fla. Stat. § 687.03(1), (3).

207. The Defendants manufactured defaults in order to trigger default-rate provisions and to extract additional charges.

208. The effective rates were 32.33% in 2024 and 29.10% in 2025.

209. Willfully and knowingly charging, taking, or receiving interest at a rate exceeding 25% per annum is criminally usurious, and an extension of credit made in violation of Fla. Stat. § 687.071 is not an enforceable debt as to either principal or interest. Fla. Stat. § 687.071(2), (3), (7).

210. Sherwood is entitled to forfeiture of the obligations, to repayment of the usurious interest and charges it paid, and to double the amount of interest taken or reserved under Fla. Stat. § 687.04.

WHEREFORE, Sherwood demands judgment declaring the Sherwood loans and the consolidated indebtedness void; awarding forfeiture of all principal and interest; awarding restitution and disgorgement of all usurious interest and charges paid by Sherwood or from Sherwood's funds; awarding double the amount of interest taken or reserved as provided by Fla. Stat. § 687.04; and granting such other relief as is just.

**COUNT IX — BREACH OF FIDUCIARY DUTY**

**(Against Alison Pitkanen and Alison Pitkanen, P.A.)**

211. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 52 through 77 and 124 through 129.

212. Pitkanen and Alison Pitkanen, P.A. owed fiduciary duties to Sherwood arising from their role as Sherwood's attorney; from their role as escrow agent holding and disbursing Sherwood's construction draws in IOLTA trust accounts; from their exclusive control over the collection and disbursement of Sherwood's money; and from the position of trust and confidence created by their simultaneous representation of multiple parties in the same transactions.

213. Those Defendants breached those duties by, among other things:

(a) taking $331,256.96 from Sherwood's job-specific trust accounts, without authorization, to fund a closing for Dixon's benefit from which Sherwood received nothing;

(b) paying themselves, and the debts of Pitkanen's relatives, ahead of the project vendors the trust accounts existed to pay;

(c) conditioning and withholding the disbursement of Sherwood's construction draws in order to compel payment of their own fees;

(d) drafting and administering loan documents that were usurious in structure while representing Sherwood's interests in the same transactions;

(e) directing and permitting Sherwood's own employee to execute false notarial certificates on instruments affecting Sherwood;

(f) failing to disburse loan proceeds as required by Section 6.2 of the Consolidated Loan Agreement;

(g) publishing a false narrative that Sherwood's president had taken the Cherry Village certificate of deposit, in order to deflect attention from their own conduct; and

(h) failing and refusing, to this day, to render any accounting of the more than $15,000,000 of Sherwood money that passed through their hands.

214. Those breaches were knowing and intentional, and were undertaken for the personal benefit of Pitkanen, her firm, and the Dixon defendants.

215. As a direct and proximate result, Sherwood lost escrowed funds, lost the benefit of its construction draws, was unable to pay the vendors whose claims now burden this estate, and suffered additional consequential damages in an amount to be proven at trial.

WHEREFORE, Sherwood demands judgment for compensatory damages, disgorgement of all fees and benefits obtained through the breaches, imposition of a constructive trust over the diverted funds and their traceable proceeds, punitive damages as permitted by law, prejudgment interest, costs, and such other relief as is just.

**COUNT X — AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

**(Against Ken Dixon, PEDIXON, LLC, ZPD, LLC, Parke Financial Limited Partnership, and Crescent Sound, Ltd.)**

216. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 52 through 99.

217. Pitkanen and Alison Pitkanen, P.A. owed and breached fiduciary duties to Sherwood as alleged in Count IX.

218. The Dixon defendants knew of those fiduciary duties. Dixon understood that Pitkanen controlled Sherwood's escrowed funds and construction draws, and he understood that by controlling the flow of loan proceeds to Pitkanen he could control Pitkanen's conduct toward Sherwood.

219. The Dixon defendants knowingly and substantially assisted the breaches: they received the $331,256.96 taken from Sherwood's job accounts; they received the benefit of the Holly Bluff closing that those funds completed; they used their control of Pitkanen's compensation to direct her conduct; and they received the diverted funds and their proceeds.

220. As a direct and proximate result, Sherwood suffered the damages alleged in Count IX.

WHEREFORE, Sherwood demands judgment for compensatory damages, disgorgement, constructive trust, punitive damages as permitted by law, prejudgment interest, costs, and such other relief as is just.

**COUNT XI — CONVERSION**

**(Against All Defendants)**

221. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 52 through 99.

222. Sherwood had a right to immediate possession of specific, identifiable funds: the construction draws deposited into the IOLTA trust accounts established for each Sherwood contract, the escrowed funds arising from the Holly Bluff closing, and the $331,256.96 taken from Sherwood's disbursing accounts.

223. Those funds were segregated, identifiable, and held for Sherwood's benefit and for the benefit of Sherwood's project vendors. They were not a general debt.

224. The Defendants exercised dominion and control over those funds in a manner inconsistent with and in derogation of Sherwood's rights: they took them, applied them to purposes of their own, transferred them among themselves, and refused to return them or account for them.

225. Sherwood demanded the return of the funds and an accounting. The Defendants refused.

226. The conversion was willful, wrongful, and undertaken with knowledge of Sherwood's rights.

WHEREFORE, Sherwood demands judgment for compensatory damages, punitive damages as permitted by law, prejudgment interest, costs, and such other relief as is just.

**COUNT XII — FRAUD IN THE INDUCEMENT**

**(Against All Defendants)**

227. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 45 through 77 and 92 through 123.

228. The Defendants made material misrepresentations of fact to Sherwood, including representations concerning the rate and lawfulness of the interest and charges imposed; the purposes for which Sherwood's construction draws would be collected and disbursed; the manner in which the Pitkanen trust accounts would be administered; the amounts actually advanced at the Holly Bluff closing; the sums Pitkanen represented she held in trust for prorations; the existence and validity of Sherwood's purported guarantee; the regularity of the notarial certificates on the instruments; and the existence of the defaults declared in January 2024.

229. The Defendants knew those representations were false when made, or made them with reckless disregard for their truth.

230. The Defendants made those representations with the intent that Sherwood rely on them by placing its collections and disbursements under Pitkanen's control, by executing documents, by continuing to perform on its contracts, and by making payments.

231. Sherwood justifiably relied on the representations. Sherwood was entitled to rely on the representations of the attorney it had engaged to hold and disburse its money.

232. Sherwood suffered damages as a direct and proximate result, in an amount to be proven at trial and not less than the sums diverted from its trust accounts, the usurious interest and charges paid, and the consequential losses flowing from its inability to pay its vendors.

WHEREFORE, Sherwood demands judgment for compensatory damages, punitive damages as permitted by law, rescission of the affected instruments, prejudgment interest, costs, and such other relief as is just.

**COUNT XIII — FORGERY, FALSE ATTESTATION, AND FABRICATION OF INSTRUMENTS**

**Fla. Stat. §§ 831.01, 831.02, and 117.105**

**(Against Alison Pitkanen, Alison Pitkanen, P.A., Ken Dixon, and PEDIXON, LLC)**

233. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 77 and 92 through 91.

234. The Defendants falsely made, altered, forged, and counterfeited written instruments, and caused instruments to be falsely certified, with the intent to injure or defraud, in violation of Fla. Stat. §§ 831.01 and 831.02.

235. The instruments include those bearing notarial certificates executed by Janelle Morea — Sherwood's employee — attesting that signatories were physically present before her when they were not, and executed at a time when she held no remote-online-notary authorization as required by Fla. Stat. §§ 117.201(10) and 117.225.

236. The instruments also include documents circulated under DocuSign envelope identifiers different from those of the originals, to which signatures and notarial pages were added after the fact that did not appear on the original instruments.

237. The Defendants uttered and published these instruments by recording them in the public records, by filing them in court proceedings, and by transmitting them to third parties in demands and correspondence.

238. Those instruments were used to assert claims against Sherwood, to encumber or claim assets, and to obtain advantage in judicial proceedings.

239. Sherwood suffered damages as a direct and proximate result, and its estate holds a claim against the surety on each notarial bond of Morea's in force when the notarizations alleged in this complaint were made, including the bond required by Fla. Stat. § 117.01(7)(a) and, as to

any notarization made after her registration as an online notary public, the $25,000 bond required by Fla. Stat. § 117.225(6).

WHEREFORE, Sherwood demands judgment for compensatory damages, punitive damages as permitted by law, cancellation of every forged, fabricated, and falsely attested instrument affecting Sherwood, recovery on the notarial bond, prejudgment interest, costs, and such other relief as is just.

## COUNT XIV — TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

## (Against All Defendants)

240. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 113 and 78 through 91.

241. Sherwood maintained advantageous business relationships with project owners, sureties, lenders, subcontractors, suppliers, and financial institutions, including Cherry Village, L.P., Trent Development, AGPM, First State Bank of the Florida Keys, and Walker & Dunlop, LLC.

242. The Defendants knew of those relationships. Pitkanen, as Sherwood's attorney and disbursing agent, knew of them in detail.

243. The Defendants intentionally and unjustifiably interfered with those relationships by withholding the construction draws that Sherwood's vendors and suppliers were owed; by diverting Sherwood's job funds to their own purposes; by publishing the false statement that Sherwood's president had taken the Cherry Village certificate of deposit; by circulating falsely attested instruments to Sherwood's business partners and closing attorneys; and by manufacturing defaults and issuing false default letters.

244. The interference was not justified by any legitimate business interest, was accomplished by improper means, and was undertaken to advance the Defendants' own scheme.

245. As a direct and proximate result, Sherwood lost the goodwill of its vendors, lost its ability to collect retainage and change-order balances, was driven into a series of collection actions, and suffered damages in an amount to be proven at trial.

WHEREFORE, Sherwood demands judgment for compensatory damages, punitive damages as permitted by law, prejudgment interest, costs, and such other relief as is just.

**COUNT XV — UNJUST ENRICHMENT**

**Pleaded in the Alternative**

**(Against All Defendants)**

246. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein.

247. Sherwood conferred benefits on the Defendants, including the construction draws diverted from its trust accounts, the $331,256.96 applied to the Holly Bluff closing, the fees taken from its funds, and the interest and charges paid on the Sherwood loans.

248. The Defendants had knowledge of the benefits and voluntarily accepted and retained them.

249. The Defendants have been enriched at Sherwood's expense, and at the expense of Sherwood's creditors.

250. Under the circumstances, it would be inequitable for the Defendants to retain those benefits without paying their value to Sherwood.

251. This count is pleaded in the alternative to Sherwood's contract-based and statutory claims.

WHEREFORE, Sherwood demands judgment for restitution and disgorgement of all benefits unjustly retained, imposition of a constructive trust, prejudgment interest, costs, and such other relief as is just.

**COUNT XVI — FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

**Fla. Stat. §§ 501.204 and 501.211**

**(Against All Defendants)**

252. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 45 through 123.

253. The Defendants engaged in unconscionable acts and practices, and unfair and deceptive acts and practices, in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1).

254. Those practices include structuring and administering loans so as to charge criminally usurious interest while disguising the excess as fees; taking control of a borrower's disbursement function and looting it; using false notarial certificates on transaction instruments; manufacturing defaults to trigger penalty provisions; and refusing to render any accounting of the funds received.

255. Sherwood is a person aggrieved by those practices within the meaning of Fla. Stat. § 501.211(1).

256. Sherwood suffered actual damages as a direct and proximate result.

WHEREFORE, Sherwood demands judgment for actual damages, declaratory and injunctive relief under Fla. Stat. § 501.211(1) and (2), attorneys' fees and costs under Fla. Stat. § 501.2105, and such other relief as is just.

## COUNT XVII — BREACH OF TRUST AND FIDUCIARY DUTY BY THE TRUSTEE OF AN EXPRESS TRUST

**Fla. Stat. §§ 736.0801, 736.0802, 736.0804, 736.0809, 736.0813, 736.1001, and 736.1002**

**(Against Crescent Sound, Ltd.)**

257. Sherwood realleges and incorporates paragraphs 1 through 161 as though fully set forth herein, and specifically paragraphs 130 through 147.

258. The Tiered Land Trust is an express trust governed by chapter 736, and Crescent Sound, as its trustee, owed the duties the Florida Trust Code imposes: to administer the trust in good faith and in accordance with its terms and the directions properly given under it, Fla. Stat. § 736.0801; to administer the trust solely in the interests of those it served and not in its own interest or its owner's, § 736.0802; to administer the trust as a prudent person would, § 736.0804; to take reasonable steps to take control of and protect the trust property, § 736.0809; and to keep the qualified beneficiaries informed and to account, § 736.0813.

259. Crescent Sound breached those duties, and failed to act where it was required to act, by, among other things:

(a) paying the rents of the trust property to its own owner and controller, as a credit against the interest the Dixon defendants charged, while the first mortgages, taxes, and assessments on the trust units went unpaid;

(b) failing to carry out the written Joint Beneficiary Instructions of September 14, 2023, including the direction to sell two units each month and the plan to pay the first mortgages;

(c) failing to take reasonable steps to protect the trust property, and permitting it to be exposed to foreclosure and enforcement proceedings that destroyed its equity;

(d) disregarding a state-court order directing that unit revenues be deposited into the court registry;

(e) disregarding the settlors' revocation and its own removal as trustee on March 17, 2025, and continuing to hold the trust property and collect its revenues after its authority ended; and

(f) failing to render any accounting of the trust property, the rents received, or their disposition.

260. Those breaches were knowing, intentional, and undertaken for the benefit of Dixon and the Dixon defendants, who owned and controlled the trustee and were at the same time the lender to whom the trustee paid the rents.

261. Sherwood brings this count as a creditor and secured party of Homemakers with an interest in trust property and its proceeds, and as a guarantor of the obligation that the trust property secured, whose exposure the trustee's breaches increased. Sherwood has been damaged as a direct and proximate result of the breaches.

262. The damages for Crescent Sound's breach of fiduciary duty as trustee include consequential, exemplary, and punitive damages, in an amount to be determined at trial.

WHEREFORE, Sherwood demands judgment against Crescent Sound, Ltd. for compensatory and consequential damages; exemplary and punitive damages as permitted by law; an accounting of the trust property, the rents received, and their disposition; surcharge and restoration of all trust property and revenues diverted; imposition of a constructive trust over those revenues and their proceeds; a declaration that Crescent Sound's authority as trustee terminated on March 17, 2025, and that its acts thereafter are void; the remedies available under Fla. Stat. § 736.1001(2); attorneys' fees and costs as allowed by law; and such other relief as is just.

**THE ENTERPRISE AND THE PATTERN OF RACKETEERING ACTIVITY**

263. The allegations of this section support Counts XVIII, XIX, and XX, and are incorporated into each of them.

264. The Defendants, together with Ken Jones, Janelle Morea, and others known and unknown, constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) and Fla. Stat. § 772.102(3) (the "Enterprise").

265. The Enterprise was an ongoing organization, formal and informal, whose members functioned as a continuing unit with a common purpose: to extract the maximum value from Sherwood and the other borrowers in the group while leaving the loss with their creditors.

266. The Enterprise was distinct from the pattern of racketeering activity in which it engaged, and each Defendant is a person distinct from the Enterprise.

267. The Enterprise had a structure. Dixon was the capital provider and director. Pitkanen and Alison Pitkanen, P.A. were the legal execution arm, preparing the documents, giving the misleading advice, and controlling the escrow and disbursement of the money. PEDIXON, LLC, ZPD, LLC, Parke Financial Limited Partnership, and Crescent Sound, Ltd. were the funding, holding, and collection vehicles. Jones, positioned inside the borrower as chief financial officer, supplied the information and the access. Morea, positioned inside Sherwood, supplied the notarial certificates.

268. The Enterprise engaged in and affected interstate commerce. The loans, the transfers, the letter of credit, and the collateral involved property and parties in Florida and in South Carolina, and the transactions were executed through interstate wire transmissions, interstate banking, and an electronic signature platform.

269. Each Defendant conducted and participated, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

270. The pattern consisted of related predicate acts, extending over a period of years from January 2022 to the present, that were not isolated and that threatened continued criminal activity. The predicate acts included:

(a) wire fraud, 18 U.S.C. § 1343 — the interstate transmission of the false closing figures, the false trust-account representations, the false default declarations, and the fabricated electronic signature envelopes;

(b) mail fraud, 18 U.S.C. § 1341 — the mailing of the default letters, demands, and instruments described above;

(c) bank fraud and fraud in connection with financial institutions, 18 U.S.C. § 1344, arising from the representations made to First State Bank of the Florida Keys and to the institutions holding the trust accounts;

(d) criminal usury under Fla. Stat. § 687.071, a predicate offense under Fla. Stat. § 772.102(1)(a);

(e) grand theft under Fla. Stat. § 812.014, a predicate offense under Fla. Stat. § 772.102(1)(a);

(f) forgery and uttering a forged instrument under Fla. Stat. §§ 831.01 and 831.02, predicate offenses under Fla. Stat. § 772.102(1)(a); and

(g) fraudulent practices and false official proceedings conduct as defined by Florida law.

271. The predicate acts had the same or similar purposes, results, participants, victims, and methods of commission: money belonging to Sherwood and its affiliates was routed through accounts the Enterprise controlled, papered with instruments the Enterprise falsified, and charged at rates the Enterprise concealed.

272. Sherwood was injured in its business and property by reason of that pattern. The injury was a direct and foreseeable result of the predicate acts and not merely of the Enterprise's existence.

**COUNT XVIII — FEDERAL CIVIL RACKETEERING**

**18 U.S.C. §§ 1962(c) and 1964(c)**

**(Against All Defendants)**

273. Sherwood realleges and incorporates paragraphs 1 through 272 as though fully set forth herein.

274. Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

275. The Enterprise described above is an enterprise within the meaning of 18 U.S.C. § 1961(4) that engaged in, and the activities of which affected, interstate commerce.

276. Each Defendant was employed by or associated with the Enterprise and conducted or participated, directly or indirectly, in the conduct of its affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

277. Sherwood was injured in its business and property by reason of that violation.

278. Sherwood is entitled to threefold the damages it sustained, the cost of the suit, and reasonable attorneys' fees under 18 U.S.C. § 1964(c), and to equitable relief.

WHEREFORE, Sherwood demands judgment against each Defendant for threefold its actual damages, the costs of this suit, reasonable attorneys' fees, prejudgment interest, equitable relief under 18 U.S.C. § 1964(a), and such other relief as is just.

**COUNT XIX — RACKETEERING CONSPIRACY**

**18 U.S.C. §§ 1962(d) and 1964(c)**

**(Against All Defendants)**

279. Sherwood realleges and incorporates paragraphs 1 through 272 as though fully set forth herein.

280. Each Defendant knowingly agreed with one or more of the other Defendants to conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity, and knowingly agreed to the commission of at least two predicate acts in furtherance of that scheme.

281. Each Defendant knew the general nature and scope of the conspiracy and knew that the conspiracy extended beyond that Defendant's individual role.

282. Overt acts in furtherance of the conspiracy were committed, including the unauthorized taking of $331,256.96 from Sherwood's trust accounts, the execution and recording of falsely attested instruments, the issuance of the January 2024 default declarations, and the transmission of fabricated documents to third parties.

283. Sherwood was injured in its business and property by reason of that violation of 18 U.S.C. § 1962(d).

WHEREFORE, Sherwood demands judgment against each Defendant for threefold its actual damages, the costs of this suit, reasonable attorneys' fees, prejudgment interest, equitable relief under 18 U.S.C. § 1964(a), and such other relief as is just.

**COUNT XX — FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES**

**Fla. Stat. §§ 772.103 and 772.104**

**(Against All Defendants)**

284. Sherwood realleges and incorporates paragraphs 1 through 272 as though fully set forth herein.

285. The Defendants engaged in a pattern of criminal activity as defined by Fla. Stat. § 772.102(4), consisting of the incidents of criminal activity described above, which had the same or similar intents, results, accomplices, victims, and methods of commission, were not isolated, and occurred within five years of each other.

286. Through that pattern, and through the collection of an unlawful debt within the meaning of Fla. Stat. § 772.102(2)(a)3. — the Sherwood loans and the consolidated indebtedness, which are unenforceable under Fla. Stat. § 687.071(7) — the Defendants received proceeds and used and invested them, acquired and maintained an interest in and control of the Enterprise and of real and personal property, and conducted and participated in the conduct of the Enterprise's affairs, in violation of Fla. Stat. § 772.103(1), (2), and (3).

287. The Defendants conspired and endeavored to violate Fla. Stat. § 772.103, in violation of Fla. Stat. § 772.103(4).

288. Sherwood was injured by reason of those violations.

WHEREFORE, Sherwood demands judgment against each Defendant for threefold its actual damages, reasonable attorneys' fees and court costs under Fla. Stat. § 772.104, injunctive and other equitable relief, prejudgment interest, and such other relief as is just.

## V. DAMAGES

289. As a direct and proximate result of the conduct alleged above, Sherwood sustained actual damages consisting of, without limitation:

(a) escrowed funds held by the Pitkanen defendants and not turned over — not less than $288,000.00;

(b) funds taken from Sherwood's job-specific disbursing accounts to fund the Holly Bluff closing — $331,256.96;

(c) additional construction draws collected into the Pitkanen trust accounts and disbursed to persons other than Sherwood's project vendors — [AMOUNT TO BE DETERMINED ON ACCOUNTING];

(d) interest, fees, and charges paid on the Sherwood loans, all of which are forfeited if the loans are criminally usurious — [AMOUNT TO BE DETERMINED ON ACCOUNTING], plus the $2,750,000.00 gross principal of the Sherwood loans subject to forfeiture under Fla. Stat. § 687.071(7);

(e) the value of Irrevocable Letter of Credit No. 154-1214 and the related contract losses — $1,008,673.80, plus the unpaid draw and retainage withheld from Sherwood — [AMOUNT TO BE CONFIRMED FROM THE PROJECT LEDGERS];

(f) consequential damages from Sherwood's inability to pay its subcontractors and suppliers, including the trade, vendor, and service claims now scheduled at $1,907,394.83 and the disputed debts scheduled at $5,017,029.24; and

(g) lost revenue and lost profit on the Cherry Village contract — not less than $1,700,000.00; and

(h) recovery on each notarial bond of Janelle Morea in force when the notarizations were made, capped at the penal sum of each bond ($25,000.00 for the bond required by Fla. Stat. § 117.225(6)).

290. Sherwood cannot state the full measure of its damages until the Defendants render the accounting sought in Count II, and pleads these amounts without prejudice to amendment.

291. The damages recoverable under Counts XVIII, XIX, and XX are subject to trebling under Fla. Stat. § 772.104 and 18 U.S.C. § 1964(c).

292. To date, Sherwood has been charged $900,000 in interest on the money borrowed to back the completion guarantee on the Cherry Village project. In addition, $118,586 from the last draw and $658,891 in retainage on the Cherry Village project have been withheld from Sherwood.

## PRAYER FOR RELIEF

WHEREFORE, Sherwood Construction, Inc., debtor and debtor in possession, respectfully requests that this court enter judgment in its favor and against the Defendants, jointly and severally where appropriate, and award:

(a) turnover to the estate of all property of the estate in the Defendants' possession, custody, or control;

(b) a full accounting from each Defendant of all funds received, held, disbursed, applied, and retained, and judgment for all sums shown due;

(c) avoidance of the transfers and obligations described in Count III, their preservation for the benefit of the estate, and recovery of the property or its value under 11 U.S.C. § 550;

(d) disallowance in its entirety of every claim asserted against this estate by PEDIXON, LLC, ZPD, LLC, or Parke Financial Limited Partnership;

(e) in the alternative, equitable subordination of every claim asserted against this estate by any Defendant to all other allowed claims;

(f) a declaration that the Sherwood loans and the consolidated indebtedness are void as criminally usurious, that Sherwood executed and authorized no guarantee, that the falsely attested instruments are cancelled, and that the trust-account funds and their proceeds are property of this estate;

(g) forfeiture of all principal and interest, restitution and disgorgement of all usurious interest and charges, and double the interest taken or reserved under Fla. Stat. § 687.04;

(h) compensatory damages in an amount to be proven at trial;

(i) treble damages under 18 U.S.C. § 1964(c) and Fla. Stat. § 772.104;

(j) punitive damages as permitted by law;

(k) imposition of a constructive trust over the diverted funds, the escrowed funds, and their traceable proceeds;

(l) temporary, preliminary, and permanent injunctive relief barring the enforcement of the void obligations and prohibiting further transfer or dissipation of the funds and property at issue;

(m) attorneys' fees and costs as provided by 18 U.S.C. § 1964(c), Fla. Stat. §§ 772.104 and 501.2105, and as otherwise allowed by law;

(n) prejudgment and postjudgment interest; and

(o) such other and further relief as this court deems just and proper.

Dated: September 29, 2026

Respectfully submitted,

/s/ Christopher L. Smith
Christopher L. Smith, Esquire
Florida Bar No. 367461
Fromang & Smith, P.A.
4767 New Broad Street
Orlando, Florida 32814
Telephone: (407) 999-9739
Email: chris@fromangsmith.com
Counsel for Sherwood Construction, Inc.,
Debtor and Debtor in Possession

## CERTIFICATE OF SERVICE

I certify that on September 29, 2026, a true and correct copy of the foregoing Complaint, together with the summons issued by the Clerk, was served by first-class United States Mail, postage prepaid, in accordance with Federal Rule of Bankruptcy Procedure 7004(b), as follows:

**Kenneth Dixon**
1627 East Vine Street, Suite E
Kissimmee, Florida 34744
(individually, Fed. R. Bankr. P. 7004(b)(1))

**PEDixon, LLC**
c/o Kenneth Dixon, Registered Agent
1627 East Vine Street, Suite E
Kissimmee, Florida 34744
(Fed. R. Bankr. P. 7004(b)(3))

**ZPD, LLC**
c/o Kenneth Dixon, Registered Agent
1627 East Vine Street, Suite E
Kissimmee, Florida 34744
(Fed. R. Bankr. P. 7004(b)(3))

**Parke Financial Limited Partnership**
c/o MFL, Inc., its General Partner
Attn: Kenneth G. Dixon, President
1627 East Vine Street, Suite E
Kissimmee, Florida 34744
(Fed. R. Bankr. P. 7004(b)(3))

**Crescent Sound, Ltd.**
c/o Kenneth Dixon, Registered Agent
1627 East Vine Street, Suite E
Kissimmee, Florida 34744
(Fed. R. Bankr. P. 7004(b)(3))

**Alison Pitkanen**
13514 Lake Mary Jane Road
Orlando, Florida 32832
(individually, Fed. R. Bankr. P. 7004(b)(1))

**Alison Pitkanen, P.A.**
c/o Alison Pitkanen, Registered Agent
1980 N. Atlantic Avenue, Suite 328

Cocoa Beach, Florida 32931
(Fed. R. Bankr. P. 7004(b)(3))

A courtesy copy was transmitted by electronic mail to kendixon@lelandenterprisesinc.com, alisonpitkanen@gmail.com, and alisonplaw@gmail.com. Electronic mail is not a substitute for service under Federal Rule of Bankruptcy Procedure 7004 and is provided as a courtesy only.

A copy was also served by CM/ECF on all parties registered to receive electronic notice in the main case, and on the Office of the United States Trustee, George C. Young Federal Building, 400 West Washington Street, Suite 1100, Orlando, Florida 32801.

/s/ Christopher L. Smith
Christopher L. Smith, Esquire